Filed 11/20/23  Gibson v. Wingfield CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JACQUELINE GIBSON et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> RICHARD BERNARD WINGFIELD et al., <br><br> Defendants and Respondents. | B317857 <br><br> (Los Angeles County Super. Ct. Nos. 19STCV02988, 19STCV03722) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph M. Hammock, Judge.  Affirmed.

Liddy Law Firm, Donald G. Liddy, Marshall J. Shepardson; Thon Beck Vanni Callahan & Powell and Gregory R. Vanni for Plaintiffs and Appellants.

Sims Law Firm, Michael Murphy, Selim Mounedji; Krutcik Law Group and James A. Krutcik for Defendants and Respondents.

_____

On April 16, 2018, Jacqueline Gibson cut across active railroad tracks near the Doheny State Beach campground in Orange County with her 71-year-old husband Ernest following close behind. Where they sought to traverse was not a pedestrian or automobile crossing, nor near one. Neither Mr. nor Mrs. Gibson looked to their left (south) before crossing, and thus did not see a passenger train barreling towards them. When the train engineer blew a warning horn, Mrs. Gibson froze on the tracks. Mr. Gibson pushed his wife off the tracks to safety but was hit by the train and killed.

Mrs. Gibson and her daughter Colleen Gibson (together, plaintiffs) thereafter sued National Railroad Passenger Corporation (Amtrak) and the train's engineer and operator Richard Bernard Wingfield (together, defendants). Plaintiffs acknowledged that Mr. and Mrs. Gibson acted negligently. Plaintiffs claimed Wingfield was also negligent and a substantial cause of the accident because he had been distracted, eating carrots and ranch dip while operating the train in the seconds before the accident. The jury found Wingfield negligent, but that Wingfield's negligence was not a substantial factor in causing harm to plaintiffs, and returned a verdict in defendants' favor.

Plaintiffs challenge the verdict on three grounds. First, they claim a special jury instruction improperly suggested defendants were not liable if Mr. and Mrs. Gibson bore any fault for the accident. Second, they contend we should reverse because the evidence at trial compelled a finding as a matter of law that Wingfield's negligence was a substantial factor in Mr. Gibson's death. Finally, plaintiffs assert the trial court abused its discretion in permitting cross-examination of Mrs. Gibson

2

concerning her negligence because she did not dispute she was partially at fault.

We conclude plaintiffs have not demonstrated prejudicial error warranting reversal, and thus affirm.

## FACTUAL AND PROCEDRAL BACKGROUND

**A.    Doheny State Beach Campground and Surrounding Area**

The accident occurred on the railroad tracks adjacent to the Doheny State Beach Campground (the campground).  Parallel to and inland from the campground is a paved road with parking.  Continuing inland are (in order from west to east) a fence, railroad tracks surrounded by ballast and dirt, a sidewalk, and then Pacific Coast Highway (PCH).  On the east side of PCH are a sidewalk and buildings, including the Riviera Beach and Shores Resort (Riviera Resort).

Near the campground to the north, the railroad tracks curve to the east and continue over a trestle bridge above PCH.  An underpass beneath the trestle bridge provides pedestrian access to the campground from the sidewalk along PCH.  The area of impact was south of and "close to" the trestle bridge.  In addition to this pedestrian crossing near the campground, there are two other crossings—both to the south of the area of impact.  Approximately 2,500 feet south of the area of impact is a pedestrian bridge over the railroad tracks.  It is undisputed the pedestrian bridge was closed on the day of the incident.  Approximately 4,300 feet south of the area of impact is Beach Road, where there is a public railroad grade crossing with lights, bells, and gates and pedestrian crosswalk traversing PCH.

## B.     The Accident

Earlier on April 16, 2018, Mr. and Mrs. Gibson walked from the campground, where they were vacationing, to the Riviera Resort.  At approximately 4:00 p.m., Mr. and Mrs. Gibson attempted to return to the campground by crossing over the railroad tracks.  After crossing, they intended to walk to the end of the fence where they could reestablish access to the public road and sidewalk leading into the campground.  The Gibsons approached the railroad tracks at an angle.  Mrs. Gibson did not look at the track to her left (towards the south) before stepping onto it.  Wingfield was operating a passenger train that day, traveling northbound between Oceanside and Los Angeles.  He began sounding the train horn two to three seconds before impact.  When Mrs. Gibson heard the train horn, she froze on the track until her husband came towards her and pushed her off.  Mr. Gibson was struck by the train before he could get clear of its path and died at the scene.

## C.     Pre-trial Procedural Background

Mrs. Gibson and her daughter Colleen[1] each filed a complaint against Amtrak and Wingfield, alleging Wingfield's negligence caused Mr. Gibson's wrongful death.[2]  Mrs. Gibson also alleged Wingfield's negligence caused her to suffer emotional distress.  In discovery responses, Mrs. Gibson admitted that she and her husband were "comparatively negligent" without any

---

[1] We refer to Colleen Gibson by her first name not out of disrespect but for ease of reference and clarity.

[2] Mrs. Gibson also sued Southern California Regional Rail Authority, also known as Metrolink, but dismissed it with prejudice during trial.

explanation of why that was so. By the time of trial, plaintiffs chose to pursue only non-economic damages.

## D.    Evidence at Trial

At trial, plaintiffs conceded Mr. and Mrs. Gibson bore some responsibility for the harm to plaintiffs, but argued defendants were also to blame and should be held accountable.

### 1.    *Jon Landerville*

Plaintiffs' accident reconstruction expert Jon Landerville analyzed information from the Event Data Recorder (EDR), videos of Wingfield's conduct as captured on two cabin cameras (one situated to Wingfield's left and another above his hands and the control panel), and a video of the view from the front of the train (the forward camera). The forward camera video depicts a zoomed-in and at least twice magnified view as compared to the engineer/operator's view. Landerville opined, however, that "the resolution of the human eye is better in terms of the ability to see" than the forward camera. These videos and/or a composite video syncing the three views (two cabin cameras and forward camera) were played for the jury numerous times during trial. The synchronized video, provided as part of the record, captures the four minutes between 15:58:00 and 16:02:00 on April 16, 2018.

Landerville testified that the train entered the "beach access road area" at a speed of 69 miles per hour (mph) and began to decelerate in anticipation of the curve that required the train's speed to be 45 mph or less. The area was a quiet zone, meaning the train could not use its horn unless there was an emergency.

Landerville opined that nothing kept Wingfield from seeing the Gibsons at 14 seconds prior to impact and that if Wingfield

5

sounded the horn at that time, the Gibsons could have heard it. At 14 seconds prior to impact, however, the cabin camera video showed Wingfield removing a carrot from a plastic sandwich bag with his right hand. Landerville opined that at eight seconds prior to impact, the Gibsons were visible to Wingfield. At four seconds prior to impact, Mrs. Gibson had not yet stepped on the track. The train struck Mr. Gibson at 15:59:14 and was travelling at 45 mph at that time.

Landerville testified that Wingfield activated the horn 2.3 seconds before impact. It took Wingfield approximately half a second from the time he saw the Gibsons to hit the horn. Landerville opined "that if [Wingfield] had looked up and ahead of the train" to see the Gibsons as late as five seconds before impact, he could have sounded the horn at 4.5 seconds before impact, giving Mr. Gibson approximately two additional seconds to react and to save his wife and himself. Landerville further testified that Wingfield misapplied the throttle with his left hand in which he held a small container of ranch dip before applying the emergency brake with his right hand.

When asked on cross-examination what effect Wingfield hitting the throttle had, Landerville testified, "We don't have enough resolution in the [EDR] readout to say what it is. It's just an indication of misapplication and, clearly, you would not want to throttle when you're about to hit somebody." After further questioning, Landerville acknowledged Wingfield hit the throttle at nearly the same time of impact; and therefore, misapplication of the throttle did not make a difference because it was already too late. Wingfield applied the emergency brake one second after impact. After Wingfield applied the emergency brake, the train took approximately 700 feet to come to rest.

Landerville further testified that Doheny State Beach is a popular area with high pedestrian and bicycle traffic due to the beach, campground, and hotels. When he visited the accident site in April and September 2021, he saw that portions of the fence dividing the beach and campground from the tracks appeared to have been cut and bent down where people had gone over it. He also described the train he observed there as "very quiet." Landerville did not know why Wingfield did not wait to arrive at the next station, which was four to five minutes away, before eating his snack.

On cross-examination, Landerville testified that according to the video, the Gibsons did not make an effort to look for a train. He acknowledged that the Gibsons were moving at a very slow speed of 1.4 mph (two feet per second), that it took them about 40 seconds to walk the 75 to 80 feet from the sidewalk to the point of impact, and that if they had walked at an average human speed of three to five feet per second, they would have had plenty of time to clear the track. He further acknowledged there were eight to 10 signs in the area warning pedestrians to not walk on the track. However, Landerville did not know whether the Gibsons would have seen those signs. Landerville acknowledged Wingfield was wearing sunglasses while conducting the train. Although Landerville could not see where Wingfield's eyes were focused, Landerville determined where Wingfield was looking based on Wingfield's head position.

2. *Jimmy Scott*

Plaintiffs' expert in train operations, Jimmy Scott, testified that the industry rules relating to railroad operations known as the General Code of Operating Rules (GCOR) require train operators to be alert and attentive at all times. He opined that

Wingfield was not alert and attentive nor maintaining a proper lookout because he was focused on carrots and ranch dip rather than the track. Scott acknowledged that neither the GCOR nor national railroad safety practices specifically prohibited train engineers from eating while operating a train, but claimed the Amtrak Standards of Excellence prohibited train personnel from eating or smoking while interacting with the public. Scott further opined that Wingfield misapplied the throttle because he was distracted or inattentive. Additionally, Wingfield violated GCOR, rule 5.8.2, paragraph 1, which requires that a train operator blow a succession of horn blasts when people are on the track. Scott opined that if Wingfield had remained alert and attentive as required, he would have seen the Gibsons in time to blow the horn at least eight seconds before impact. Immediately after the accident, Wingfield called his conductor and stated that he had been staring at the positive control (PTC) screen.[3] Scott testified he did not believe the PTC screen played a part in distracting Wingfield.

On cross-examination, Scott acknowledged there are times when a train engineer did not need to use hands to operate the train. He also testified that when he inspected the site of the

---

[3] Scott testified the federal government requires PTC screens on trains as a safety measure. The screen "displays any track restrictions that you have, curve restrictions, or you may even have an area that you have what's called a slow order or you could have an area where you have . . . a work order . . . and the signal indication from the one—the signal closest to you. And the second out signal away from that one, which lets the engineer know what's out there as far as proceeding or traction issues." It also displays the train's speed.

8

accident, he did not step off of the sidewalk because he did not know "where the railroad right-of-way was" and did not want to "trespass on it."

### 3. *Rami Hashish, PhD*

Plaintiffs' expert in biomechanics, Dr. Rami Hashish, opined that Mr. Gibson pushed his wife to the other side of the tracks and then tried to step backwards from the tracks. The Gibsons each needed 1.2 seconds to react and run, but it took Mr. Gibson between 1.5 to 1.7 seconds to push his wife off the track. After doing so, Mr. Gibson still needed 1.2 seconds to clear the path of the train. In other words, Mr. Gibson needed a total of 2.7 to 2.9 seconds to push his wife and clear the track. Wingfield hit the horn 2.3 seconds prior to impact. Thus, according to Dr. Hashish, if Wingfield sounded the horn approximately a half-second earlier, Mr. Gibson could have saved both his wife's life and his own. Dr. Hashish acknowledged, however, that both of the Gibsons had enough time to perceive, react, and move off the track to avoid the accident after Wingfield sounded the horn if both the Gibsons had just run. He testified that it was not ordinarily the case for people to freeze when they hear a loud sound. Rather, "[t]he typical response is to move and to move fast."

### 4. *Mrs. Gibson*

Outside the jury's presence, counsel and the court discussed whether defendants could examine Mrs. Gibson concerning her negligence notwithstanding her response to a request for admission that she was "comparatively negligent." Plaintiffs argued that because Mrs. Gibson admitted negligence, any further inquiry would be irrelevant or unnecessary under Evidence Code section 352. The trial court observed that because

the trier of fact would need to assign percentages of negligence, the details were important to determining the degree of negligence. The court permitted counsel to cross-examine Mrs. Gibson on the issue.

During cross-examination, Mrs. Gibson testified that after arriving at the campground on April 16, 2018, the Gibsons decided to walk to the Riviera Resort, where they had had a timeshare for 15 to 20 years. They walked south, along the beach. They walked past the pedestrian bridge and saw that it was closed. Approximately 45 minutes after they started their walk, they arrived at Beach Road where they crossed the track, used a crosswalk to cross PCH, then walked on the sidewalk, heading north toward the Riviera Resort.

Instead of turning south to retrace their steps after the Gibsons exited the Riviera Resort, they walked north and crossed PCH near the Riviera Resort's swimming pool, where there was no crosswalk. They then continued north on the sidewalk.

The Gibsons left the sidewalk and walked over the dirt and ballast towards the tracks. Mrs. Gibson acknowledged that she did not look to her left before walking onto the track. She testified, "I heard the horn. I looked—I saw the train and I froze."

She further testified, "I believe that we're responsible for being on the railroad tracks, and I don't know how to legally say—am I legally responsible for the entire thing? No. We made a mistake. I admit we made a mistake that I will admit. I'll take that. It was a decision made from a situation that we thought it would be okay."

When the Gibsons left the Riviera Resort, they planned to go under the trestle bridge underpass but changed their course

because Mrs. Gibson was frightened by a biker and two backpackers near the bridge. She acknowledged she and Mr. Gibson could have waited to see if the backpackers would leave, gone back to Beach Road to cross, or asked the Riviera Resort to call them a cab to the campground. She further acknowledged that if they had chosen one of the alternatives, Mr. Gibson would not have been struck by the train. As she stepped onto the tracks, she was not thinking about the fact that it was safest to cross them quickly; she walked at a normal pace. She looked for an oncoming train to the right, but not to the left. When asked if she looked to the left in the 20 feet before she reached the tracks, she responded, "I'm not real good on the distance. I just remember the overview. We were just looking. Couldn't hear anything. Did look all the way down the track when we started approaching to the left, looked to the right, didn't see anything." Counsel then asked if she looked to the left around "10 paces or so." Mrs. Gibson responded, "I think I did not look to the left when I got up on the track. I may have missed that over there too." She knew that when they deviated from the sidewalk onto the dirt and ballast that they were in an area that they should not have been.

     5.    *Wingfield*

At the time of the accident, Wingfield had operated a train on that route hundreds of times in both directions but had never seen trespassers between Beach Road and the area where the accident occurred. He had never seen anyone trying to get into the campsite through the fence.

On April 16, 2018, Wingfield looked out at the track multiple times, but as was usual, after he passed the pedestrian bridge, "that's really the last time that my focus is on the tracks.

Because if they're clear by then, then it's—just it's more important for me at that point to start focusing on my gauges and my speed to try to get the train down to 45 [mph]." He testified it takes time to slow the train because of its weight, because slowing with the least amount of braking is safer and more comfortable for the passengers, and because slowing gradually gave him time to react if there was anything wrong with the brakes. Wingfield also testified that operating a train requires him to do several equally important things that divide his attention, including looking at the track, looking at the gauges, looking at the PTC screen, monitoring and adjusting the train's speed, and looking at and calling in the block signals.[4] When he looked at the tracks as he passed the pedestrian bridge location that day, he did not see anything on the track. He was aware the pedestrian access bridge over the tracks was closed that day.

Wingfield's practice was to blow the horn before using the emergency brake because, according to Wingfield, it was the most effective way to get someone away from the track and because pulling the emergency brake can be violent for passengers. He testified that "as soon as I saw [the Gibsons], I sounded the horn and I didn't understand why . . . it happened." Wingfield testified it was not a true statement that he had been staring at the PTC screen before the accident. He agreed that if he had seen the Gibsons eight or five seconds before impact, he would have

---

[4] Signals, which are visible beside the track, divide sections of railroad tracks into blocks. Before entering a block, the signal informs the operator about the condition of the block that the train is about to enter. The operator calls the signal over the radio to the conductor. The signal Wingfield called was that the track was clear.

sounded the train's horn. When he blew the horn, he believed the Gibsons had time to get out of the way, but he remembered Mrs. Gibson "freezing."

### 6. *Timothy Long*

Defendants' accident reconstruction expert Timothy Long testified that the train's forward camera captured images beginning at approximately 150 feet in front of the train. He explained that if the train was parked on the goal line of a football field, the first image that could be seen on the forward camera would be the mid field. To demonstrate the perspective, Long presented a slide to the jury of an orange traffic cone on the tracks as recorded by the forward camera and as seen through the windshield. Long opined that when Mrs. Gibson stepped onto the railroad track, she was 150 feet away from the train. He agreed with Dr. Hashish that if the Gibsons had run when they heard the horn, they could have cleared the track.

### 7. *Foster Peterson*

Defendants' expert in railroad accident reconstruction and train operations, Foster Peterson, testified that on April 16, 2018, 40 trains were scheduled to go through the area of impact. Per the schedule, five trains other than Wingfield's train went through the area between noon and 4:00 p.m.

Peterson described that three lights on the front of the train form a triangle pattern, which was designed to make trains conspicuous and unique from other vehicles. The lights can be seen from miles away under certain conditions and are "really really bright and really really hot." Further, there is always some amount of sound emanating from the train due to the steel wheels against the track, rotating machinery, and the wind being pushed out of the way. The sound level depends on numerous

13

factors including the speed, whether the train is accelerating, and whether the train is going through a curve.

Peterson testified that under federal regulations, an engineer can operate a train for 12 hours. Peterson was not aware of any rule that restricts an engineer from eating while operating the train during these 12 hours. He has eaten while operating a train and has seen other engineers do so. He opined it was not difficult to do as there were times when an engineer may operate a train with their hands free. For example, the brake lever and throttle may be "set" for some time.

Peterson presented a summary of the EDR information correlated with Wingfield's action as seen on the video. The summary includes, inter alia, what Wingfield was doing at different times and distances from the point of impact. Peterson described several actions Wingfield took, including calling in the signal, adjusting the throttle and brake to decelerate for the upcoming curve as early as seven-eighths of a mile before, and hitting a button to reset the alerter[5] which had stared to flash but not yet beep. He testified that in the first five of the eight seconds before impact, the PTC screen showed the train's speed was at 46 mph, consistent with Wingfield looking at the screen to monitor his speed as he tried to reach 45 mph before the curve. He further testified that while operating a train, an engineer may look at the PTC screen, the speedometer, the gauge reporting

---

[5] A button, known as an alerter, ensures the engineer is still alert. It will flash and then beep every so often if the engineer has not touched any of the controls for a while. The engineer may reset the alerter by pushing the button or pushing a different button or moving the throttle or brake.

14

how much electrical power is being generated by the locomotive, and the brake gauges.

Peterson testified that contrary to what Landerville stated, Wingfield applied the emergency brakes first, and a fraction of a second later, hit the throttle. Hitting the throttle had no effect because the train's emergency brakes deactivate the throttle. He further opined that if Wingfield had hit the emergency brake at 2.3 seconds before impact instead of the horn, there would not have been enough time for the brakes to apply and materially slow the train. Indeed, according to the EDR, the train took approximately 700 feet and 19 seconds to come to rest after Wingfield applied the emergency brake.

Peterson opined Wingfield acted within the standard of care for a certified locomotive engineer. Peterson also testified that eating at the prior stop would not have been a good choice as the stop was 40 seconds long, the engineer needed his hands to manipulate the controls to prepare to move, and because the engineer acts as a back-up for the conductor to ensure the platform is clear of people. Peterson further opined that eating carrots and ranch dip did not cause Wingfield to be distracted. Rather, the actions on the videos and captured by the EDR demonstrated Wingfield was alertly and attentively operating the train.

8.  *Gavin Huntley-Fenner, PhD*

Defendants' expert, Dr. Gavin Huntley-Fenner, has a doctorate in cognitive sciences. He has education and experience in, among other things, conspicuity. "Broadly defined[, conspicuity] is the ability to pick out an object, let's say visually, against a background. . . . There are specific characteristics of

15

on[e] that might make them more or less conspicuous, it depends on the context and, of course, the ability of the viewer, et cetera."

Dr. Huntley-Fenner observed that the video depicted the Gibsons walking behind a pile of rocks on their approach to the tracks and then transitioning onto bluish-colored ballast, into which Mr. Gibson's blue jeans blended. He opined that this blending helped to explain why Wingfield did not see Mr. Gibson earlier. He also explained that movement plays a factor in being able to see an object. An object moving perpendicularly to the viewer is easier to see than one that is still or moving towards the viewer. The slower something moves, the less likely it is to draw attention. Additionally, what a person expects to see will affect their ability to perceive and react to it. If Wingfield had never seen anyone cross the track at that location, it would lengthen his perception response time. Because the people watching the video expect to see an accident, they are inclined to see it more clearly. However, a person watching the video, expecting to see the accident, may not have noticed there was a pedestrian on the sidewalk, two bicyclists waiting at the grade crossing, a pedestrian walking in the parking lot, and another pedestrian on the sidewalk.

Dr. Huntley-Fenner opined that "in the area where the collision occurred that there was enough information for a rational[ ], attentive, alert pedestrian to understand that there was regular train traffic and to appreciate the risks of trespassing."[6] That Mrs. Gibson felt for vibrations on the track

---

[6] Dr. Huntley-Fenner noted there were enough trains in the area that the Riviera Resort disclosed to its guests that the trains would be audible.

16

or looked north (right) to check for a train indicated she understood a train may be coming along.  He opined that Mr. and Mrs. Gibson, if they had looked, would have been able to see the train after it emerged from the pedestrian bridge, which according to the video was approximately 30 to 35 seconds before impact, "and then it would become increasingly obvious."  He testified, "It is baffling how an attentive alert person would not have their attention captured by a train that's coming up on you very fast, 50 miles an hour is fast.  And when you're out there, they are big and they are fast.  And you see them [a] thousand feet away, 500 feet away your eye is drawn to them, your ear picks them up.  So I'm trying to understand that, how would that happen, how does an alert attentive person deal with that. . . . The only thing that comes to mind to help explain that is Mrs. Gibson's own testimony that she was in conversation with her husband.  And you can see that there's some interaction between them on the video."  He agreed with Dr. Hashish's opinion that the normal reaction is not to freeze, but to run and that if the Gibsons had done so, given normal expected perceptions and reactions of humans under these circumstances, they both would have cleared the track.  Dr. Huntley-Fenner also emphasized that the forward camera video did not capture the last 150 feet before impact.

He opined that the Gibsons were in a better position to notice and avoid an imminent collision than the engineer.  The train would have been perceptible for a longer time to the Gibsons than they would have been to the engineer due to the Gibsons' relatively small size and low conspicuity.  At the time the Gibsons were 500 feet away from the train, they were smaller than the train cabin buttons from Wingfield's perspective.

17

Dr. Huntley-Fenner also opined Wingfield's reaction time was astoundingly fast and indicated he was alert and attentive. "[A]s he's pressing the button for the horn, the thought process that began that press . . . occurred at least a second before that." Thus, Wingfield saw the Gibsons closer to 225 feet away than 150 feet away.[7] He clarified that multi-tasking is not the same as being distracted. He further testified that moving one's head is not necessarily an indication of where your eyes are focused. Thus, determining where someone is looking without looking at their eyes is not possible to do with scientific certainty.

On cross-examination, Dr. Huntley-Fenner testified that there was no physical object between Wingfield and the Gibsons that prevented Wingfield from seeing them five seconds before impact. Further, if Wingfield had blown the horn eight seconds before impact, the Gibsons would have heard it.

9. *Officer Jacqueline Labarbera*

Officer Jacqueline Labarbera testified that immediately after the accident, Mrs. Gibson told her that she had wanted to avoid going under the trestle bridge because there were usually homeless people there, and she had decided to take a shortcut over the tracks.

10. *Kevin Banks*

Kevin Banks, superintendent of operations for Amtrak, was responsible for relevant day-to-day operations and ensuring rule compliance. He testified locomotive engineers, who can legally work up to but no more than 12 hours a day, are allowed to eat

---

[7] The forward camera video shows Wingfield beginning to move his right hand toward the horn at 15:59:11, approximately three seconds prior to impact.

snacks while operating trains and that there are no federal rules or regulations that prohibit the engineer from eating while operating a train. Wingfield chose an appropriate area to do so because the area was straight, flat track, which would not require throttle and grade manipulations, and because the area is not known for heavy pedestrian traffic. Thus, he had no criticism of where Wingfield chose to eat.

Banks further testified that he reviewed the videos shortly after the accident to determine whether there were any rule violations. After reviewing the video, Banks "didn't see any improper train handling, any rule violations associated with the trespasser strike and that, you know, as far as I was concerned the engineer operated the train according to Amtrak's rules, policies and procedures." He testified Wingfield was alert and attentive.

### E.    The Verdict Form

Before closing arguments, the court and parties discussed the verdict form and jury instructions. The first two questions on the special verdict form asked the jury: "1. Was [Wingfield] negligent?" and "2. Was [Wingfield]'s negligence a substantial factor in causing harm to [p]laintiffs?" The trial court mused, "I'll probably tell the jury if they answer 1 yes, they've got to answer 2 yes. . . . I haven't decided yet. But this is not a causation case." Defense counsel disagreed, and explained, "Wingfield sounds the horn 2.3 seconds before impact. [Dr.] Hashish, their own expert, says that the Gibsons had plenty of time with time to spare to get off the track. 1.1 seconds to spare. . . . [Dr.] Hashish also says that the typical average reasonable reaction is to run when you hear a train horn. . . . Mrs. Gibson froze in the center of the track." The trial court responded, "If they answer question two

19

wrong, I'm very likely to overturn that finding. That's all I'm going to say. . . ."

Questions 8 through 11 on the verdict form asked whether Mrs. Gibson, and separately Mr. Gibson, were negligent and whether for each of them, their negligence was a substantial factor in causing harm to plaintiffs. Plaintiffs asked that each of the four questions be pre-marked with the answer yes on the verdict form before it was distributed to the jury. The form also asked, "If 100% represents the total fault that was the cause of [Mr. Gibson]'s death, what percentage of this 100% was due to the fault of each of the persons listed below?" The form then listed Wingfield, Mrs. Gibson, and Mr. Gibson with blank lines and percentage marks after each of their names.

Additional relevant trial-related background is described in the Discussion section, *post*.

## F.    The Verdict

The jury found Wingfield was negligent but that his negligence was not a substantial factor in causing the plaintiffs' harm. Seven out of the nine jurors responded yes to the question of whether Wingfield was negligent and nine out of nine responded no to the question of whether Wingfield's negligence was a substantial factor in causing the harm to plaintiffs.

## G.    Motion For New Trial

On November 18, 2021, plaintiffs filed a motion for a new trial on the issue of causation. Plaintiffs argued one of the special instructions (No. 3) misled the jury and that substantial evidence did not support the jury's causation finding in the special verdict form. Special instruction No. 3 was entitled, "A RAILROAD TRACK IS A WARNING OF DANGER" (bold omitted) and stated, "The mere presence of railroad track in and

20

of itself is an adequate warning of danger as a matter of law. The danger posed by railroads is obvious and there is no duty to warn adults of obvious dangers."

On December 22, 2021, the trial court heard and denied the motion. Before ruling the trial court explored whether the jury's two factual findings were inconsistent. It observed that plaintiffs had presented more than one theory of negligence, including eating while operating the train and hitting the throttle. It also observed there was testimony that Wingfield's "reaction was almost superhuman," indicating that he was alert, and that even if he had not been eating, "the ordinary reasonable prudent engineer in that situation would not have seen . . . the Gibsons in time." Further, the court observed that, "I must have said it 50 times that—just because the plaintiffs were negligent, doesn't mean they lose. That there's going to be a comparison . . . [a]nd the verdict would be lowered" based on the comparative negligence of the parties in causing the accident.

The trial court thereafter entered judgment.

## DISCUSSION

### A. The Trial Court Did Not Prejudicially Err in Giving Special Instruction No. 3

Plaintiffs first argue we should reverse because special instruction No. 3's statement that active railroad tracks are an obvious danger misled the jury into believing plaintiffs were barred from obtaining any recovery as a matter of law. We do not find this claim persuasive.

#### 1. *Standard of Review*

We review the propriety of jury instructions de novo. (*Conservatorship of K.P.* (2019) 39 Cal.App.5th 254, 265.) We

21

evaluate the propriety of a challenged instruction in the context of the instructions as a whole. (*Ibid*.) We will not reverse a judgment for instructional error unless the error results in a miscarriage of justice. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) "When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is *reasonably probable* that instructions allowing application of an erroneous theory *actually* misled the jury.' " (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682, quoting *Soule v. General Motors Corp.*, *supra*, at p. 581, fn. 11.)

    2.    *Additional Relevant Background*

    a.    *Voir Dire*

During voir dire, the trial court advised the venire about comparative fault at least four times.[8] For example, the trial court explained, "The law does allow for more than just one person to be a cause of the accident and negligent. There's a possibility under the law that both the plaintiff and the defendant can be negligent. . . . So it would be your job under my instructions to still analyze whether the defendant did anything wrong that was negligent as a matter of law . . . [a]nd that that negligence caused—was a substantial factor in one of the causes of the accident. . . . [T]here's a possibility that there could be negligence on both sides and this is when you would attribute the negligence percentages of both sides, okay, under the instructions. . . . [Y]ou're not just going to shut down just because the plaintiff admits they did something wrong by

_____

[8] The entirety of the jury voir dire was not transcribed. This number reflects only what appears in the record.

22

walking on the railroad tracks. . . . Because it's not the end of the case under the law. . . . They will have to produce evidence that persuades you under the law that the defendant was also negligent and that was a substantial factor in the accident."

b.     *Opening Statements*

During plaintiffs' opening statement, Mrs. Gibson's counsel told the jury, "So you understand that your job is to [find] percentages of fault, of course." Defense counsel did not argue that if the Gibsons were negligent, defendants could not also be negligent.

c.     *Jury Instructions*

During discussion concerning proposed jury instructions, the court indicated it would give what was eventually numbered as special jury instruction No. 3: "The mere presence of railroad track in and of itself is an adequate warning of danger as a matter of law. The danger posed by railroads is obvious and there is no duty to warn adults of obvious dangers."**9** Plaintiffs'

---

**9** In support of proposed special instruction No. 3, defendants cited the following authorities: "CACI [No.] 806; see *Joslin v. So[uthern] Pac. Co.* (1961) 189 Cal.App.2d 382, 386-387 ['[n]o adult in possession of his faculties could claim nondiscovery of the danger or non-realization of the unreasonable risk which entering the area [of a railroad track], or intermeddling, would entail']; *Green v. Los Angeles [etc. Ry.] Co.* (1904) 143 Cal. 31, 36 [' [" 't]he railroad track of a steam railway must itself be regarded as a sign of danger, and one intending to cross must avail himself of every opportunity to look and listen for approaching trains[' "] ']; *Christoff v. Union Pac[ific] Railroad Co.* (2005) 134 Cal.App.4th 118, 126-127 [' ["]A railroad track upon which trains are constantly run is itself a warning to any person who has

counsel argued the instruction was unnecessary because Mrs. Gibson admitted fault. Counsel further argued the instruction suggested that Wingfield did not have to do anything and "look[ed] like a directed verdict." Defendants' counsel argued the instruction was relevant to comparative fault, which remained a jury issue even with Mrs. Gibson's concession. The trial court ruled it would give the instruction.

Relevant here, the court also indicated it would give (and did in fact give) jury instructions concerning the burden of proof (CACI No. 200), plaintiff's contributory negligence (CACI No. 405), apportionment of responsibility (CACI No. 406), comparative fault of decedent (CACI No. 407), substantial factor (CACI No. 430), and "[c]ausation: [m]ultiple [c]auses" (CACI No. 431). CACI No. 200 instructed the jury, that, inter alia, "After weighing all of the evidence, if you cannot decide whether a party has satisfied the burden of proof, you must conclude that the party did not prove that fact." CACI Nos. 405 to 407 each referred to percentages of responsibility. CACI No. 431 stated, "Wingfield cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [p]laintiffs' harm."

### d. *Closing Arguments*

During closing arguments, both counsel for plaintiffs reminded the jury no less than eight times that its task would be to assign percentages of fault between Wingfield and the

---

reached years of discretion, and who is possessed of ordinary intelligence, that it is not safe to walk upon it, or near enough to it to be struck by a passing train["] ']."

24

Gibsons.[10]  In one instance, Mrs. Gibson's counsel stated, "[W]hen I first saw this, this video, I said to myself, . . . it's 50/50 . . . .  The Gibsons saw the train about two seconds before impact.  The operator saw them around two, three seconds before impact. . . .  [M]aybe this should be divided 50/50.  But as I thought a little bit more about it, and I thought about the duties of someone who's getting paid to do a job that safety is so important in, this is—this is your decision.  What percentage to put on the . . . defendants. . . .  [Mrs. Gibson has] told me from the beginning, she—she takes blame.  So this is not going to the issue

---

[10] During closing argument, plaintiffs' counsel also stated:

"The verdict form asks simple questions.  No. 1, was defendant negligent?  And it asks whether that negligence was a substantial factor.  And then it asks for you to value the loss and harm suffered by this family.  We've admitted that [Mr. and Mrs. Gibson] were negligent.  So that is not an issue in this case.  Then you'll be asked to decide the percentages of fault between defendant and the Gibsons.  That's it."

"I just want to remind you as you deliberate about the careless conduct of the operator, during that discussion, you don't consider the fault of the Gibsons.  That's been admitted and that comes up when you go into the percentages."

"As you're discussing the Amtrak negligence, if someone says well, I think the Gibsons were at fault.  You say that's right.  They admit it.  But you focus on the Amtrak responsibility, and then at the end, you talk about percentages."

The operator's negligence "does not have to be the only cause of harm."

"So you don't consider—when you're considering comparative fault, the judge reduces the damage by the percentage of responsibility.  So if you were to find say 10 percent, your judgment, your verdict gets reduced by 10 percent.  The judge does that."

of whether [Mrs. Gibson] takes blame or not. . . . This goes to the issue of percentages. Who should have the biggest percentage. It's your decision."

Colleen's counsel explained, "Some jurors may say I have a lot of trouble with this case because the Gibsons never looked. You can say in response to that, that's true. They've admitted that. In fact, we have admitted it so strongly that we asked the judge to precheck the box for you . . . . [W]e've admitted that [the Gibsons] were negligent, but Amtrak cannot escape responsibility just because [the Gibsons] were also a substantial factor. So they don't get to go home just because the Gibsons made a mistake. We have to evaluate Amtrak's conduct as well."

Defense counsel twice reminded the jury that if it found Wingfield liable, its job was to allocate blame.

During rebuttal argument, Mrs. Gibson's counsel stated, "The last thing I'm going to talk about is percentages. . . . [For Mr. Gibson,] I would suggest to you a very low percentage. One or [2] percent for [Mr. Gibson]. [Mrs. Gibson has] accepted responsibility. We went through the—the huge responsibility that an operator of a million pound train has. . . . So that is a huge percentage of negligence compared to a lady who's out for a walk who's not going to hurt anybody. I would suggest to you [5] to [10] percent. And the reason—even though we've admitted responsibility, the reason they made this whole trial about criticizing [the Gibsons], is to try to get you to give the 50/50. If you give them 50/50, they'll be clanking the champagne glasses out there in their hotel room after your verdict." Plaintiffs asked the jury to value Mrs. Gibson's and Colleen's damages at $20 million and $15 million, respectively.

3.    *Analysis*

Plaintiffs argue special instruction No. 3 caused the jury to apply the pre-*Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 doctrine of strict contributory negligence, which barred a plaintiff from obtaining any recovery when the plaintiff's own negligent conduct contributed to causing the harm suffered.  (*Id*. at p. 808.)  Because we conclude it is not reasonably probable that the instruction misled the jury, we need not also determine whether the instruction was erroneous.  (See *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580 ["A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.'  (Cal. Const., art. VI, § 13.)"].)

First, the special instruction does not refer to strict contributory negligence expressly or indirectly.  It states only that, "A Railroad Track Is a Warning of Danger [¶] The mere presence of railroad track in and of itself is an adequate warning of danger as a matter of law.  The danger posed by railroads is obvious and there is no duty to warn adults of obvious dangers."  (Bold and capitalization omitted.)  In other words, there is no duty to warn an adult that a railroad track is dangerous.  Plaintiffs make no serious attempt to argue this is incorrect or that there was a duty to warn by posting signs, placing additional fencing, or something else.

Plaintiffs instead argue the instruction was prejudicial because it can be read as a directive to absolve the defendants by giving the impression that Wingfield had no legal duty to sound the train's horn to warn Mr. and Mrs. Gibson of the train's approach.  As stated above, that is not a commonsense reading of

27

the instruction. Instead, it is reasonably construed as addressing testimony elicited at trial suggesting defendants were negligent because Mrs. Gibson was able to access the track where she did and did not see any warning signs before she attempted to cross.

Moreover, nothing suggests plaintiffs' interpretation is how the jury understood special instruction No. 3. The trial court and counsel repeatedly made clear to the jury throughout the proceedings that both the Gibsons and defendants could be negligent and a substantial cause of the harm and, if so, the jury's duty was to apportion blame between them: during jury selection, during opening statements, and during closing arguments.

Additionally, several jury instructions explained to the jury that both the Gibsons and Wingfield could be substantial factors in causing plaintiffs' harm. CACI No. 431 directly dispelled the misimpression plaintiffs argue the jury was under in stating, "Wingfield cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [p]laintiffs' harm." CACI Nos. 405 and 407 informed the jury that if it found Mr. or Mrs. Gibson negligence was a substantial cause, plaintiffs' damages would be reduced by the jury's determination of the percentage of her or his responsibility. CACI No. 406 reinforced that if the jury found more than one person was a substantial factor, "you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form."

Finally, we observe that the verdict form directed the jury, "If 100% represents the total fault that was the cause of [Mr. Gibson]'s death, what percentage of this 100% was due to the fault of each of the persons listed below?" The form then listed

28

Wingfield, Mrs. Gibson, and Mr. Gibson with blank lines followed by percentage marks after each of their names. These questions are not readily reconcilable with the misimpression that plaintiffs claim the special instruction created.

We find it highly improbable in the face of these repeated admonitions, arguments, jury instructions, and special verdict form that the jury would somehow misinterpret special instruction No. 3 as prohibiting it from finding defendants liable as a matter of law. Indeed, the jury's verdict that Wingfield was negligent indicates it found Wingfield had a legal duty and breached it. If the special instruction had misled the jury as plaintiffs claim into thinking plaintiffs' negligence was the end of the story, the jury would have considered any finding as to defendants being superfluous; indeed, it would have wondered why it was even being sent to deliberate given Mrs. Gibson's admission of negligence. The jury instead asked no such question.

Thus, plaintiffs have not carried their burden on appeal to demonstrate that special instruction No. 3 misled the jury and resulted in a miscarriage of justice.

**B.    The Evidence Does Not Compel a Finding that Wingfield's Negligence Was a Substantial Factor as a Matter of Law**

1.    *Standard of Review*

Plaintiffs next contend that substantial evidence does not support the jury's finding that Wingfield's negligence was not a substantial factor in causing the accident. However, " '[i]n the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the

29

failure-of-proof issue as whether substantial evidence supports the judgment. . . . [Instead,] the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. . . .' [Citation.]" (*Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) "This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that 'plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof.' [Citation.]" (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651.)

     2.    *Analysis*

Plaintiffs suggested Wingfield could have been negligent in more than one way, including that he was not alert and attentive, his hands were occupied by eating carrots and ranch dip, and he misapplied the throttle. "Where, as here, there is no special finding on what negligence is found by the jury, the jury's finding is tantamount to a general verdict. As long as a single theory of negligence is lawfully rebutted on a lack of causation theory, it matters not that another theory of negligence is not so rebutted." (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 26.)

The jury could have found Wingfield was negligent for hitting the throttle, but that doing so did not cause plaintiffs' harm. Plaintiffs contend that misapplication of the throttle "was never presented or argued as an independent 'negligent act.'" This ignores that one of their experts testified that Wingfield erred by hitting the throttle as the train approached Mrs. Gibson. Or the jury could have found Wingfield negligent for eating a

30

snack, but found that plaintiffs failed to show by a preponderance of the evidence that eating the snack caused him to be inattentive or that it was a substantial factor contributing to the accident given testimony about how difficult it was for Wingfield to see the Gibsons from a distance.

Plaintiffs argue the jury's "incongruous" causation finding had no basis because it was "undisputed" that the train colliding with Mr. Gibson caused his death and "that the engineer's conduct contributed to that collision." They base their argument on the testimony of defendants' expert, Dr. Huntley-Fenner, who they claim acknowledged the Gibsons "were visible to Mr. Wingfield, at the latest, eight seconds before impact," implying Wingfield was inattentive for not seeing them at that time.

However, Dr. Huntley-Fenner did not testify as plaintiffs' claim. He did testify that five seconds prior to impact, there was nothing obstructing Wingfield's view of the Gibsons and that eight seconds prior to impact, they would have heard the train horn. But the gravamen of Dr. Huntley-Fenner's testimony was that Wingfield's failure to see the Gibsons sooner was not necessarily a result of inattentiveness. Rather, several factors could affect his ability to perceive the Gibsons, including the color of the clothes they wore relative to the background, their small size from his relative distance, their slow gait, and Wingfield's expectation, based on his experiences, that pedestrians would not cross at that location, especially because there was a pedestrian underpass nearby.

Moreover, as Wingfield and Peterson testified, an engineer's attention may be properly and necessarily diverted from looking outside of the windshield to accomplish other operational tasks, such as monitoring and adjusting speed.

31

Further, plaintiffs suggested to the jury that Wingfield was negligent not only because eating carrots and ranch dip distracted him visually, but because the hands that "activate controls are occupied with eating food." Yet, defendants presented substantial evidence that an engineer could safely operate a train without his hands from time to time. Thus, the jury had an evidentiary basis for doubting plaintiffs' claim that Wingfield was unalert and inattentive, notwithstanding its possible determination that his eating carrots and ranch dip was negligent.

*Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362 provides a helpful comparison. In that case, a general contractor was killed when a construction truck backed over him at a job site. (*Id*. at p. 364.) The truck's driver had a high level of marijuana metabolite in his urine in violation of federal safety regulations. (*Id*. at pp. 365, 367.) However, several witnesses had spoken with the driver before and after the accident and observed no signs of impairment. (*Id*. at p. 368.) Other witnesses testified the driver had checked his mirrors and backed up slowly, activating a backup alarm that could be heard as far as 200 feet away. (*Ibid*.) The decedent, who suffered from ongoing health problems and rarely visited jobsites, had been standing in a blind spot behind the truck, in violation of his own safety rules. (*Id*. at pp. 368-369.) The jury found the driver was negligent, but that his negligence was not a substantial factor in causing the fatality. (*Id*. at p. 364.) The Court of Appeal affirmed, concluding, "this accident would have happened whether or not [the] defendant driver was under the influence of marijuana. [The d]ecedent was run over because he was just not paying attention to the hazards of the jobsite." (*Id*. at p. 370.) Here, the

jury could have similarly found that the accident would have occurred even if Wingfield had not been eating carrots and ranch dip.

Additionally, the undisputed testimony from both sets of experts was that Wingfield had sounded the horn early enough for the Gibsons to clear the track if they had both run. Instead of running, Mrs. Gibson froze on the tracks, causing her husband to step in harm's way. Given this evidence as well as Dr. Huntley-Fenner's testimony relating to Wingfield's ability to perceive the Gibsons, the jury could have found that plaintiffs simply did not carry their burden of proof on the element of causation. Indeed, the trial court had instructed the jury, "After weighing all of the evidence, if you cannot decide whether a party has satisfied the burden of proof, you must conclude that the party did not prove that fact." Because the evidence at trial did not compel a finding of causation in favor of plaintiffs as a matter of law, we find no reversible error. (See *Dreyer's Grand Ice Cream, Inc. v. County of Kern, supra*, 218 Cal.App.4th at p. 838.)

## C. The Trial Court Did Not Abuse Its Discretion in Allowing Cross-examination of Mrs. Gibson

### 1. *Standard of Review*

Plaintiffs lastly claim the trial court abused its discretion by failing to restrict defendants' cross-examination of Mrs. Gibson. Generally, an appellate court may not disturb a trial court's ruling admitting or excluding evidence absent an abuse of discretion. (*Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 446-447). "An abuse of discretion is found if the court exercises discretion in an arbitrary, capricious or patently absurd manner resulting in a manifest miscarriage of justice." (*People v. Shaw* (1998) 64 Cal.App.4th 492, 496.)

33

2.     *Analysis*

Plaintiffs argue the trial court erred in permitting defendants to cross-examine Mrs. Gibson concerning her "errors in judgment" and "numerous trivial subsidiary [matters]" when it was "self-evident" that she was negligent and admitted she was partially to blame for the accident.  In particular, plaintiffs identify a portion of defendants' cross-examination that relates to two transients or backpackers Mrs. Gibson saw near the trestle bridge.  They argue the defense raised the topic "entirely for the purpose of creating the appearance that [Mrs. Gibson was] trying to excuse her conduct."

Permitting such cross-examination was not an abuse of discretion.  " 'The comparative fault doctrine "is designed to permit the trier of fact to consider all relevant criteria in apportioning liability.  The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an "equitable apportionment or allocation of loss." ' [Citation.]"  [Citation.]' [Citation.]" (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 591-592.)

It is true Mrs. Gibson admitted she and Mr. Gibson bore some responsibility for the accident.  It is not true, however, that this concession meant there was nothing left to prove about the magnitude of Mrs. Gibson's fault.  The jury had yet to determine the level of responsibility to assign to each of the Gibsons and to Wingfield.  In doing so, the jury was not limited to deciding only how much responsibility Wingfield should bear and then subtracting that number from 100 percent.  It could " ' " 'consider

and evaluate the [parties'] relative responsibility.' " ' " (*David v. Hernandez, supra,* 226 Cal.App.4th at pp. 591-592.)

Plaintiffs' citation to *Fuentes v. Tucker* (1947) 31 Cal.2d 1 to argue that Mrs. Gibson's admission precluded such cross-examination is inapposite. In *Fuentes,* the defendant admitted full legal responsibility for the wrongful death; there was no issue of comparative negligence. (*Id*. at pp. 3, 5.) The court found the defendant's concession of full responsibility meant the court should have excluded evidence offered only to prove liability, but "[t]his, of course, does not mean that an admission of liability precludes a plaintiff from showing how an accident happened if such evidence is material to" other issues. (*Id*. at p. 5.) Unlike the defendant in *Fuentes*, Mrs. Gibson did not concede full responsibility for the accident; she conceded only that she was comparatively negligent without anything more. This meant the parties' relative negligence was thus very much at issue, and additional evidence on that topic relevant and admissible.

Defendants' questions probed whether the presence of the two backpackers prevented the Gibsons from safely using the nearby trestle bridge underpass to access the campground instead of crossing over the tracks. Whether the Gibsons could have chosen a different, safe route to the campground is relevant to the jury's determination of the Gibsons' degree of fault. Indeed, although it may have been "self-evident"[11] that Mrs.

---

[11] Plaintiffs point to the trial court's comment that it was "self-evident" that it was negligent for Mrs. Gibson not to look and that the court ruling to permit the testimony was therefore "a mystery." However, plaintiffs ignore that just moments before, the trial court stated, "If there was no issue of comparative

35

Gibson was negligent not to look for the train, the jury could have also found she was negligent for choosing to cross the tracks in the first instance.  Thus, this questioning was not irrelevant, cumulative, or unduly prejudicial.  (See Evid. Code, §§ 210, 350, 352.)[12]

_____

negligence . . . and they're admitting full negligence, then maybe the details are not relevant . . . [b]ut here the details are relevant because they go to the percentage of negligence that the jury . . . would want to attribute to that particular negligence."

[12] Plaintiffs erroneously claim the topic of the backpackers "was raised entirely by the defense."  Mrs. Gibson first raised the issue by claiming immediately after the accident that the presence of persons under the trestle bridge explained why she and her husband cut across the tracks where they did.  Before Mrs. Gibson took the stand, her attorney questioned Orange County Deputy Sheriff Wesley Dean.  In providing an offer of proof as to a certain line of questioning of Deputy Dean, Mrs. Gibson's attorney stated, "I just wanted to get some background about—there's an issue as to whether there's people around the track, whether they are homeless people or that kind of thing." The trial court asked, "Because it might corroborate your client's testimony about—she was concerned about some transients or unseemly people across the street?"  Mrs. Gibson's counsel stated, "Sure."  Plaintiffs also called the Gibsons' friend, Christine Ullerich.  During Ullerich's cross-examination, defense counsel asked Ullerich what Mrs. Gibson had told her about the date of the accident.  She responded, "She told me that they were trying to cross to go to the beach but the pedestrian gate had been closed off, the one that they would have normally taken, across the tracks.  And she told me that they had—that there was a group of homeless people that were there that had made her feel very, very uncomfortable."

Plaintiffs further argue the trial court erred in permitting other portions of the cross-examination because they were cumulative and "had no bearing on the issues actually in dispute." However, plaintiffs do not identify what testimony they contend should have been excluded and instead cite generally to 72 pages of the transcript—not all of which is even Mrs. Gibson's cross-examination. The defense cross-examined Mrs. Gibson on a variety of topics, including her familiarity with the area, the route she took that day, her knowledge concerning whether the railroad tracks there were active and dangerous, her awareness of other paths to return to the campsite that did not involve crossing over the tracks and her reasons for not taking them, whether and when she looked for a train, and her ability to hear the train or feel the train's approach. Each of these topics was relevant to how the jury might apportion blame. Accordingly, the trial court did not abuse its discretion in allowing defendants' cross-examination of Mrs. Gibson.

## DISPOSITION

The judgment is affirmed. Defendants are awarded their costs on appeal.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.        CHANEY, J.

37